IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHAEL P. SKIZENTA,  )<br><br>Plaintiff,  )<br>)<br>vs.  )<br>)<br>COMMISSIONER OF SOCIAL SECURITY  )<br>ADMINISTRATION,  )<br>)<br>Defendant.  )<br>) | CASE NO.  1:23-CV-01407-PAG<br><br>JUDGE PATRICIA A. GAUGHAN<br>UNITED STATES DISTRICT JUDGE<br><br>MAGISTRATE JUDGE<br>JONATHAN D. GREENBERG<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff, Michael Skizenta ("Plaintiff" or "Skizenta"), challenges the final decision of Defendant, Martin O'Malley,[1] Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

### I.  PROCEDURAL HISTORY

In February 2021, Skizenta filed an application for POD and DIB, alleging a disability onset date of February 21, 2018, and claiming he was disabled due to COPD, obstructive sleep apnea, nocturnal hypoxia, and high blood pressure.  (Transcript ("Tr.") 15, 56.)  The application was denied initially and upon reconsideration, and Skizenta requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

---

[1] On December 20, 2023, Martin O'Malley became the Commissioner of Social Security.

1

On May 18, 2022, an ALJ held a hearing, during which Skizenta, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.*) On June 2, 2022, the ALJ issued a written decision finding Skizenta was not disabled. (*Id.* at 15-28.) The ALJ's decision became final on May 24, 2023, when the Appeals Council declined further review. (*Id.* at 1-6.)

On July 21, 2023, Skizenta filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 9, 11.) Skizenta asserts the following assignment of error:

(1) The ALJ's RFC finding is not supported by substantial evidence because the assessment of Plaintiff's symptom allegations did not comply with the requirements of SSR 16-3p.

(Doc. No. 9.)

## II. EVIDENCE

### A. Personal and Vocational Evidence

Skizenta was born in January 1967 and was 55 years-old at the time of his administrative hearing (Tr. 27), making him a "person of advanced age" under Social Security regulations. *See* 20 C.F.R. § 404.1563(e). He has at least a high school education. (Tr. 27.) He has past relevant work as a machine operator II. (*Id.* at 26.)

### B. Relevant Medical Evidence[2]

On October 4, 2018, Skizenta saw primary care physician Thomas Maguire, D.O., for follow up regarding his sleep apnea and medication refills. (*Id.* at 209.) Dr. Maguire noted Skizenta's last follow up was a year ago. (*Id.*) Skizenta reported fatigue but "rare" daytime sleepiness and denied any coughing,

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs. As Skizenta challenges only the ALJ's findings regarding his physical impairments, the Court further limits its discussion of the evidence to Skizenta's physical impairments.

wheezing, or shortness of breath. (*Id.* at 209-10.) On examination, Dr. Maguire found a BMI of 53.16, lungs clear to auscultation bilaterally, no edema, and normal muscle strength. (*Id.*) Dr. Maguire refilled Skizenta's prescriptions and instructed him to follow up in a year. (*Id.* at 210.)

On January 20, 2020, Skizenta saw Dr. Maguire for his annual physical and reported no complaints. (*Id.* at 206.) Skizenta denied any coughing, wheezing, or shortness of breath. (*Id.* at 207.) On examination, Dr. Maguire found a BMI of 54.74, lungs clear to auscultation bilaterally, no edema, and normal muscle strength. (*Id.* at 206.) Dr. Maguire ordered lab work and instructed Skizenta to follow up in a year. (*Id.* at 207.)

Skizenta underwent a spirometry pulmonary function test ("PFT") on November 5, 2020. (*Id.* at 643.) At that time, Skizenta's height was 67.2 inches and his weight was 346.1 pounds, indicating a BMI of 54. (*Id.*) Kathrin Nicolacakis, M.D., determined that spirometry was normal, there was no significant bronchodilator response, TLC, RV, and RV/TLC were normal, and the diffusing capacity was normal. (*Id.* at 639.) Dr. Nicolacakis determined these results met the criteria for acceptability and repeatability. (*Id.* at 643.) Skizenta was diagnosed with COPD. (*Id.* at 648.)

On May 24, 2021, Skizenta saw Dorothy Bradford, M.D., for a consultative examination. (*Id.* at 232-40.) Skizenta reported a chief complaint of COPD and told Dr. Bradford he had been using BiPAP and was doing well. (*Id.* at 239.) On examination, Dr. Bradford found Skizenta "severely morbidly obese." (*Id.*) Dr. Bradford further found lungs clear to auscultation bilaterally, no wheezes, rales, or rhonchi, normal strength, normal range of motion, and an "even and regular" gait. (*Id.* at 239-40.)

As part of the consultative examination, Skizenta underwent another PFT. (*Id.* at 237.) Dr. Bradford recorded a height of 67 inches and a weight of 343 pounds. (*Id.*) The PFT revealed an FEV1 that was 65% of predicted and a lung age of 86. (*Id.*) The PFT further revealed a post-bronchodilator FVC and FEV1 of 2.93 and 2.43, respectively. (*Id.*) Dr. Bradford stated, "In my medical opinion

3

claimant has restrictive lung disease due to severe morbid obesity. There are no activity restrictions." (*Id.* at 240.)

On September 8, 2021, the Agency contacted Dr. Maguire requesting records of any examination of Skizenta from April 2021 through September 2021. (*Id.* at 242.) Dr. Maguire stated Skizenta had not visited his office during that timeframe. (*Id.*)

On October 5, 2021, Skizenta saw Dr. Maguire for his annual physical. (*Id.* at 709.) Skizenta wanted to discuss getting a COVID vaccine and his COPD progression. (*Id.*) Skizenta denied chest pain and denied shortness of breath, both at rest and with exertion. (*Id.* at 710.) On examination, Dr. Maguire found lungs clear to auscultation bilaterally, no edema, normal motor strength, and normal sensation. (*Id.*) Skizenta's diagnoses consisted of obstructive sleep apnea, unspecified heart failure, centrilobular emphysema, and essential hypertension. (*Id.*)

On November 29, 2021, Skizenta underwent an initial cardiology consultation to rule out heart failure. (*Id.* at 620.) Skizenta's symptoms consisted of shortness of breath, edema, and chest pain. (*Id.*) A transthoracic echocardiogram taken that day revealed normal findings, although it was a technically difficult exam due to Skizenta's COPD and obesity. (*Id.* at 620-22.) Skizenta's diagnosis consisted of heart failure, unspecified type/chronicity. (*Id.* at 618, 620.)

On December 27, 2021, Skizenta saw Theresa Gersin, CNP, for complaints of congestion and COVID exposure after his wife tested positive. (*Id.* at 706.) Skizenta endorsed body aches, productive cough, hot/cold flashes, and sweats over the weekend, but his symptoms had resolved for the most part. (*Id.*) He reported he was just sore from coughing now. (*Id.*) Skizenta denied chest pain and shortness of breath at rest, although he endorsed shortness of breath with exertion that was no worse than usual for him with his COPD. (*Id.*) Gersin prescribed dexamethasone. (*Id.* at 707.)

On January 8, 2022, treatment providers admitted Skizenta to the hospital after he arrived at the emergency room with complaints of worsening shortness of breath, coughing, wheezing, congestion, body aches, nausea, and decreased appetite.  (*Id.* at 561.)  He reported his shortness of breath was worse with any activity, even minimal activity, or at rest.  (*Id.*)  Treatment providers discharged Skizenta on January 24, 2022.  (*Id.*)  At discharge, Skizenta's diagnoses consisted of acute hypoxic respiratory failure secondary to COVID-19 pneumonia, 9 mm pulmonary nodule in the right upper lobe, essential hypertension, suspected diabetes mellitus, Type II, morbid obesity, and thrush.  (*Id.* at 562.)  Khalid Elamin, M.D., directed Skizenta to follow up with his primary care physician in one week.  (*Id.* at 562, 564.)

On January 31, 2022, Skizenta saw Dr. Maguire for follow up after his hospitalization.  (*Id.* at 703.)  Skizenta reported using 6 liters of oxygen at home and 4 liters of oxygen when traveling.  (*Id.*)  Skizenta endorsed fatigue, weight loss, change of appetite, productive cough, shortness of breath with exertion that was no worse than usual for him with his COPD, and wheezing.  (*Id.*)  He denied shortness of breath at rest.  (*Id.*)  On examination, Dr. Maguire found Skizenta "severely ill-appearing" with a "tachy" heartrate, diminished breath sounds throughout the lungs, scattered inspiratory wheezes, poor air movement, and 2+ pitting edema of the lower extremities.  (*Id.* at 704.)  Skizenta's diagnoses consisted of COVID-19, unspecified chronic respiratory failure, unspecified post COVID-19 condition, and unspecified tachycardia.  (*Id.*)

On February 7, 2022, Skizenta saw Dr. Maguire for follow up.  (*Id.* at 700.)  Skizenta reported using 3 liters of oxygen when traveling and 5 liters of oxygen at home.  (*Id.*)  He was still experiencing thrush.  (*Id.*)  Dr. Maguire noted lab work revealed low calcium and high glucose.  (*Id.*)  Skizenta denied shortness of breath at rest and with exertion.  (*Id.* at 701.)  On examination, Dr. Maguire found lungs clear

5

to auscultation bilaterally and no edema. (*Id.*) Skizenta was to return to the office in one week. (*Id.* at 702.)

On February 15, 2022, Skizenta saw Dr. Maguire for follow up. (*Id.* at 697.) Skizenta reported using 3 liters of oxygen when traveling and 5 liters of oxygen at home. (*Id.*) Skizenta denied shortness of breath at rest and with exertion. (*Id.* at 698.) On examination, Dr. Maguire found lungs clear to auscultation bilaterally and no edema. (*Id.*) Dr. Maguire noted that when oxygen was removed, Skizenta "ambulated a quick pace in [the]office hallway," which increased his pulse to 109 and decreased his oxygen saturation to 90%. (*Id.*) His oxygen saturation "quickly recovered." (*Id.*) Dr. Maguire recommended decreasing oxygen to 4 liters for one week, then 3 liters for two weeks, and then follow up. (*Id.* at 699.)

On March 1, 2022, Skizenta saw Dr. Maguire for follow up. (*Id.* at 694.) Skizenta reported using 2 liters of oxygen when traveling and 3 liters of oxygen at home. (*Id.*) He told Dr. Maguire that with exertion and no oxygen, his oxygen readings were in the low 90s and once was 89. (*Id.*) Skizenta had been tracking his pulse ox with exertion before he got sick, and it was in the low 90s. (*Id.*) He told Dr. Maguire his heart rate with exertion was around 110. (*Id.*) He also complained of continued swelling in his right leg. (*Id.*) Skizenta denied shortness of breath at rest and with exertion. (*Id.* at 695.) On examination, Dr. Maguire found lungs clear to auscultation bilaterally and no edema. (*Id.*) Dr. Maguire discontinued supplemental oxygen. (*Id.* at 696.)

On April 12, 2022, Skizenta saw Dr. Maguire for follow up and reported no concerns at that time. (*Id.* at 691.) On examination, Dr. Maguire found lungs clear to auscultation bilaterally and no edema. (*Id.* at 692.) Dr. Maguire stated Skizenta was "pretty much completely recovered" and did not need to follow up for his post-COVID condition. (*Id.*) However, Skizenta needed to follow up regarding his chronic conditions. (*Id.*)

On February 7, 2022, Dr. Maguire completed a Pulmonary Questionnaire. (*Id.* at 604-06.) Skizenta's diagnoses consisted of COPD, COVID-19 pneumonia, respiratory failure, hypertension, and hyperglycemia. (*Id.* at 604.) Dr. Maguire expected these impairments to last at least 12 months and determined Skizenta's prognosis to be "guarded; cautious." (*Id.*) Dr. Maguire identified the following medical signs associated with Skizenta's impairments: dyspnea on exertion; wheezing; sputum production; chest pain; emphysema; chronic bronchitis; and lung hyperinflation. (*Id.*) Dr. Maguire opined that Skizenta's COPD met the criteria of GOLD Classification Stage IV consistent with "Very Severe COPD – Severe airflow limitation (FEV1/FVC < 70%; FEV1 < 30% predicted) or FEV1 < 50% predicted plus chronic respiratory failure. Patients may have Very Severe (Stage IV) COPD even if the FEV1 is > 30% predicted, whenever this complication is present." (*Id.* at 605.) Dr. Maguire noted supplemental oxygen had been prescribed. (*Id.*) Dr. Maguire answered "yes" in response to the question "As a result of these medical impairments, does your patient retain the functional ability to work in a competitive environment, in even a sedentary occupation, on a full-time, 8 hours a day, 5 days a week basis?" (*Id.*) Dr. Maguire opined Skizenta could sit for 0-1 hour in an eight-hour workday and stand/walk for 0-1 hour in an eight-hour workday. (*Id.*) Skizenta could frequently lift up to 10 pounds, occasionally lift 10-20 pounds, and never lift over 20 pounds. (*Id.*) He could carry up to 5 pounds frequently, 10-20 pounds occasionally, and never carry over 20 pounds. (*Id.*) He could not tolerate dust, smoke, or fumes. (*Id.*) He would need to rest at unpredictable times. (*Id.*) He would be absent more than three times a month. (*Id.* at 606.) Dr. Maguire further opined that Skizenta's "exertional dyspnea causes activity limitation." (*Id.*)

C. **State Agency Reports**

On July 5, 2021, Mehr Siddiqui, M.D., reviewed the file and determined Skizenta could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. (*Id.* at 59-60.) His

7

ability to push and/or pull was unlimited, other than shown for lift and/or carry. (*Id.* at 59.) Skizenta could stand and/or walk for about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday. (*Id.*) Skizenta must avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc. (*Id.*)

On October 9, 2021, on reconsideration, Steve McKee, M.D., affirmed Dr. Siddiqui's findings. (*Id.* at 66.)

**D.     Hearing Testimony**

During the May 18, 2022 hearing, Skizenta testified to the following:

- He lives in a house with his wife. (*Id.* at 39.) He holds a valid driver's license, and he drives. (*Id.* at 40.)

- On a typical day, he wakes up, makes himself some breakfast, and watches the news. (*Id.* at 43.) He tries to do some housework, "which doesn't usually go very well." (*Id.*) He tries to keep himself busy. (*Id.*) He does not usually run errands, but he may go to the store for groceries. (*Id.*) He tries to do yard work on occasion to get outside, but he "usually end[s] up sitting around." (*Id.*) He builds models, although he hasn't done that in a while, and he collects coins. (*Id.*) He does not visit with friends or volunteer. (*Id.* at 44.) He sometimes does laundry to help his wife. (*Id.*) The washer and dryer are in the basement. (*Id.*)

- He stopped working because he could no longer handle the heavy lifting, standing, and walking. (*Id.*) He has no stamina. (*Id.*) He cannot do anything on his feet for a long period of time without having to sit down and catch his breath. (*Id.*) He felt it was better for him and the company that he quit his job. (*Id.*)

- He cannot work now because of his stamina. (*Id.* at 45.) He cannot do anything without losing his breath. (*Id.*) He has to sit down and take a break doing any kind of strenuous activity. (*Id.*) Sometimes he gets a flare without warning, and he cannot breathe at all; he has to sit down and take his medication while he tries to catch his breath. (*Id.*) He has a hard time tying his shoes, getting dressed, showering, etc. (*Id.*) He loses his breath walking up a flight of stairs or during any kind of exertion. (*Id.* at 46.) He has recovered "[f]or the most part" from COVID. (*Id.*) He experiences fatigue. (*Id.* at 47.) He usually takes naps or breaks during the day. (*Id.*) He has trouble walking. (*Id.* at 48.) He starts to feel out of breath at about 50 feet or so, and after 100 feet he needs to catch his breath or slow down. (*Id.*) He believes he is "slightly worse" after COVID. (*Id.* at 49.)

- His wife cuts the grass; he can't really do that anymore. (*Id.* at 47.) His ability to perform household chores is limited. (*Id.*)

- Dust, smoke, or inhalants of that nature cause breathing problems. (*Id.* at 47.)

- His doctor has talked to him about losing weight. (*Id.* at 48.) He is still trying to determine how he can exercise without losing his breath, but he has changed his diet. (*Id.*)

- He uses a BiPAP machine at night and gets a good night's sleep. (*Id.*)

The VE testified Skizenta had past work as a machine operator II. (*Id.* at 50-51.) The ALJ then posed the following hypothetical question:

> Ms. Hall, assume a hypothetical individual of the claimant's age and education and with the past job that you described. Further, assume that this individual is limited as follows. So this is a medium exertional hypothetical but with the following additional limitations. This person can only occasionally climb ramps and stairs. This person can tolerate no more than frequent exposure to dusts, odors, fumes, and pulmonary irritants. Can this hypothetical individual perform any of the – perform the past work that Mr. Skizenta performed?

(*Id.* at 51-52.)

The VE testified the hypothetical individual would be able to perform Skizenta's past work as a machine operator II. (*Id.* at 52.) The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as dining room attendant, kitchen helper, and stores laborer. (*Id.*)

In response to questioning from the ALJ, the VE testified there would be no skills that would transfer to light or sedentary work. (*Id.*)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Skizenta was insured on the alleged disability onset date, February 21, 2018, and remained insured through March 31, 2022, the date last insured ("DLI"). (Tr. 15-16.) Therefore, in order to be entitled to POD and DIB, Skizenta must establish a continuous twelve-month period of disability

commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on March 31, 2022.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of February 21, 2018 through his date last insured of March 31, 2022 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: chronic obstructive pulmonary disease (COPD); obstructive sleep apnea; obesity; and hypertension. (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) with additional limitations. He can lift or carry 50 pounds occasionally and 25 pounds frequently; stand for 6 hours; walk for 6 hours; and sit for 6 hours and can push/pull as much as he can lift/carry. He can climb ramps and stairs occasionally. He can tolerate no more than frequent exposure to dust, odors, fumes and pulmonary irritants.

6. Through the date last insured, the claimant was capable of performing past relevant work as a machine operator II (DOT #619.685-062, medium, SVP 3, performed at medium). This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant was not under a disability, as defined in the Social Security Act, at any time from February 21, 2018, the alleged onset date, through March 31, 2022, the date last insured (20 CFR 404.1520(f)).

(Tr. 18-28.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In his sole assignment of error, Skizenta argues he "is entitled to judicial relief" because the ALJ's explanation for discounting Skizenta's subjective symptom allegations lacked the support of substantial evidence. (Doc. No. 9 at 10.) Skizenta "takes issue" with the ALJ's treatment of his allegations of fatigue, lack of stamina, and shortness of breath. (*Id.*) Skizenta asserts that the objective medical evidence supports his allegations regarding the intensity, persistence, and functional limitations of his fatigue and shortness of breath. (*Id.* at 12.) In addition, Skizenta maintains that the ALJ never considered

the impact his severe obesity, in combination with his severe sleep apnea, had on his ability to sustain work activities over time, as required by SSR 19-2p. (*Id.*) Skizenta argues that the ALJ "never attempted to explain why" Skizenta's allegations regarding his fatigue and lack of stamina were discounted. (*Id.* at 12-13.) Skizenta asserts the ALJ's decision lacks "specific reasons for the weight assigned to his symptom allegations, and [] it is unclear to Plaintiff and a reviewing court how the ALJ evaluated Plaintiff's statements when assessing Plaintiff's RFC in violation of SSR 19-2p." (*Id.* at 13.) In addition, the ALJ's reasoning for discounting Skizenta's allegations of shortness of breath were "not 'consistent with and supported by the evidence,'" necessitating remand. (*Id.* at 14.) Skizenta maintains the ALJ's errors were harmful, as a limitation to light or sedentary work would have been "case determinative." (*Id.*)

The Commissioner responds that substantial evidence supports the ALJ's subjective symptom determination. (Doc. No. 11 at 6.) The ALJ's "detailed decision" identified the evidence that led to his determination that Skizenta's subjective complaints were inconsistent with the record evidence. (*Id.*) The Commissioner argues that "[u]ltimately, Plaintiff simply did not like the ALJ's final conclusion based on that evidence." (*Id.*) The Commissioner asserts Skizenta's argument that the ALJ failed to properly consider his fatigue and shortness of breath is "unavailing," as the ALJ "explicitly noted" complaints of fatigue and shortness of breath but determined the evidence of record did not support the conclusion that Skizenta's fatigue and shortness of breath were work preclusive. (*Id.* at 7.) The ALJ further found the "extreme limitations" opined by Dr. Maguire to be unsupported by Dr. Maguire's treatment records and inconsistent with Dr. Bradford's consultative examination. (*Id.* at 9.) In addition, Skizenta's argument that the ALJ failed to consider his obesity in combination with his other impairments "should be quickly rejected," as the ALJ found Skizenta's obesity to be a severe impairment and discussed Skizenta's BMI multiple times in the decision. (*Id.* at 10.) Furthermore, Skizenta failed to meet his burden of producing

14

evidence showing additional limitations the ALJ had to consider because of his obesity but did not. (*Id.* at 11.)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). *See also* SSR 16-3p,[3] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[4] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated

---

[3] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the May 18, 2022 hearing.

[4] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should consider.[5] The ALJ need not analyze all seven factors but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Skizenta's testimony and other statements regarding his symptoms and limitations, including his lack of stamina and shortness of breath. (Tr. 21.) The ALJ determined Skizenta's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (*Id.*) However, the ALJ found his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision. (*Id.* at 21-22.) Specifically, the ALJ found as follows:

> The records summarized above fail to support the claimant's allegations regarding the severity, intensity, and persistence of his symptoms. First, aside from his hospitalization for Covid 19, there is no indication of exacerbations

---

[5] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

> of COPD leading to emergency room treatment. The two pulmonary function tests in the record demonstrate restrictive lung disease, but do not support the claimant's allegations of severe dyspnea with any type of exertion. I note a rather substantial gap in the treatment records from October 2018 until January 2020, when no treatment was evident in the record. Finally, at many of his appointments, the claimant denies cough, wheezing, shortness of breath, and physical examinations contain findings of clear lung sounds. (Exhibits 1F/7-8, 10-11; 7F/3-12, 21). The claimant's representative argued at hearing that the documentation from the physical examinations should not be considered reliable, as Dr. Maguire referred the claimant for testing with the indication of "shortness of breath." However, I am not at liberty to substitute supposition for documentation from medical records. Additionally, if these records were discarded as unreliable, there would be little to no evidence available to make any kind of finding regarding the claimant's residual functional capacity.

(*Id.* at 24-25.)

In analyzing Dr. Maguire's opinion, the ALJ further found as follows:

> On February 7, 2022, Thomas Maguire, DO completed a form entitled "Pulmonary Questionnaire" at the request of the claimant's representative. He said that he had been treating the claimant since November 2016 for COPD, and that he also had been diagnosed with Covid-19 pneumonia and respiratory failure, hypertension and hyperglycemia. He indicated that the claimant's impairments because dyspnea on exertion, wheezing, sputum production, chest pain, emphysema, chronic bronchitis, and lung hyperinflation. He said that the claimant has stage IV COPD, indicating severe airflow limitation, and that he requires supplemental oxygen. He offered the specific limitations that the claimant can sit for 0-1 hours and stand/walk for 0-1 hours in an 8-hour workday, occasionally lift and carry 10 to 20 pounds, and cannot tolerate exposure to dust, smoke, and fumes. Dr. Maguire further opined that the claimant would need to rest at unpredictable intervals during a work shift and would be absent from work more than 3 times per month. (Exhibit 5F).

> Dr. Maguire's opinion is not persuasive. First of all, the summary of his physical examination findings is inconsistent with the limitations he proposes. With the exception of one office visit following the claimant's discharge from the hospital in January 2022, Dr. Maguire's physical examination notes document clear lung sounds. (Exhibit 1F/7; 7F/two, 9, 21). In fact, the "Review of Systems" sections of almost all of the claimant's appointments in Dr. Maguire's office show that he denied wheezing, or shortness of breath at rest or with exertion. (Exhibits 1F/11-13; 7F/6, 9, 12). Finally, this opinion was provided in the immediate follow-up. After the claimant's hospitalization for Covid 19. Dr. Maguire's more recent assessment from April 2022 notes indicate that the claimant no longer requires follow-up, except with regard to his chronic conditions. (Exhibit 7F/3).

17

(*Id.* at 25-26.)[6]

> In analyzing the state agency reviewing physicians' opinions, the ALJ found as follows:
>
>> At the initial level of the claim, on July 5, 2021, state agency medical consultant Mehr Siddiqui, MD rendered a residual functional capacity finding as follows: medium exertion, as defined in the regulations; and avoid "concentrated pulmonary irritants". (Exhibit 2A/4-5). Medical consultant Steve McKee, MD affirmed this finding at the reconsideration level of the claim, on October 9, 2021. (Exhibit 4A/4). The shared opinion of the state agency medical consultants is persuasive, although I included an additional limitation to occasional climbing of ramps and stairs and specified additional pulmonary irritants to which the claimant must limit exposure. I have further reworded the residual functional capacity finding so that it is expressed in vocationally relevant language using terms defined in regulation.

(*Id.* at 25.)[7]

The Court finds substantial evidence supports the ALJ's assessment of Skizenta's subjective complaints. The record evidence, as noted by the ALJ, is not entirely consistent with Skizenta's allegations of disabling conditions. (*Id.* at 21-26.) The ALJ credited some of Skizenta's subjective symptoms but did not accept them to the extent alleged by Skizenta because of findings on examinations, his own statements, and gaps in treatment, factors to be considered under the regulations. (*Id.*) Furthermore, the ALJ's extensive discussion of the relevant medical evidence included several findings that undercut a finding of disability (*id.*), including statements that daytime sleepiness was "rare" and that "he had been using a BiPAP for two years, which was effective." (*Id.* at 22.) The Court finds it is able to trace the path of the ALJ's reasoning regarding the subjective symptom evaluation in the decision. The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton*, 246 F.3d at 772-73.

The Court also rejects Skizenta's argument that the ALJ never considered the impact his severe obesity, in combination with his severe sleep apnea, had on his ability to sustain work activities over time,

---

[6] Skizenta does not challenge the ALJ's findings regarding Dr. Maguire's opinion. (Doc. No. 9.)
[7] Skizenta does not challenge the ALJ's findings regarding the state agency reviewing physicians' opinions. (Doc. No. 9.)

as required by SSR 19-2p. (Doc. No. 9 at 12.) At Step Two, the ALJ found obesity to be a severe impairment. (Tr. 18.) At Step Three, the ALJ explained: "In this case, the record indicates that the claimant has restrictive lung disease, and that his obesity contributes to the limitations he experiences with breathing. Therefore, when evaluating whether the claimant's respiratory impairments meet the requirements of a listing, I considered his obesity." (*Id.* at 20.) Throughout the RFC analysis, the ALJ discussed findings in the treatment records concerning obesity, mentioning specific BMI measurements in the process. (*Id.* at 22-24.) In addition, the ALJ found the opinion of consultative examiner Dr. Bradford "not fully persuasive" "because it fail[ed] to take into account the combined effects of obesity and COPD." (*Id.* at 25.)

There is no error.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: March 28, 2024

    *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).